Adley W. Hemphill v. Commissioner.
Hemphill v. Commissioner
Docket No. 29620.
United States Tax Court
1951 Tax Ct. Memo LEXIS 47; 10 T.C.M. (CCH) 1080; T.C.M. (RIA) 51331; October 31, 1951
*47 A. Sieber Hollinger, Esq., and Sidney B. Gambill, Esq., for the petitioner. Fortescue W. Hopkins, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: The petitioner herein seeks redetermination of deficiencies in income tax for 1944 and 1945 of $334.63 and $527.62, respectively. The sole issue is whether agricultural losses sustained during the taxable years are deductible as losses of an enterprise conducted for profit. Some of the facts were stipulated. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner filed his returns on the cash method and calendar year basis with the collector of internal revenue for the twenty-third district of Pennsylvania. Petitioner is a certified public accountant, residing and maintaining an office in Pittsburgh, Pennsylvania. During the years 1941 through 1946, inclusive, petitioner reported net income before exemptions in the following approximate amounts: $6,100, $6,120, $8,280, $7,760, $9,850, and $8,000, respectively. In 1938 petitioner decided to purchase a country property. For several years he examined many properties in the vicinity of Butler and Limestone *48 Counties, Pennsylvania. In September 1941, at a cost of $1,200, petitioner purchased 16 acres of land located in Concord Township about 46 miles from Pittsburgh. The property contained a one-story frame house, a chicken house, meat house, pig pen, and garage. Approximately five acres consisted of second growth timber; about one acre adjacent to the house and garage had been used at one time for gardening; and the remaining ten acres were tillable. At the time of the purchase the property had not been worked as a farm for approximately 30 years. The property is located in a neighborhood of small famrs, and there were no resort estates or luxury farms in the vicinity. After acquisition of the property, petitioner applied for and received a government allotment of lime to fertilize his tillable acreage. In 1941 petitioner's family consisted of his wife and two sons who were 15 and 13 years of age, all of whom lived with petitioner from that time through the years in controversy. Petitioner and his sons had not had previous experience in farming. During the taxable years petitioner had a partially paralyzed right arm. Petitioner's sons learned how to plow, harrow, cultivate, sow, and *49 do other farm labor, learning from a neighboring farmer. In 1942 petitioner paid $743.37 to put the house in tenantable condition and to prepare some acreage for cultivation. During that year, about four acres were cleared of brush and trees, the chicken coop and pig pens were repaired, and the former garage was converted into a tool and storage shed. To provide a water supply, petitioner constructed a reservoir and installed a pump adjacent to a spring. Subsequently he had a deep well drilled. Extension lines for electricity were installed. Two pigs, some chickens, sheep, ducks, and two geese were acquired during 1942 and 1943. Labor was performed by petitioner, his sons, and a neighboring farmer. No income or expense for the property was reported by petitioner for the taxable year 1942. In the latter part of 1942 petitioner was informed by the county committee representing the Department of Agriculture that he would receive two tons of lime, and he was advised that a corn crop on the four acres which he had cultivated should yield sufficient feed for his two pigs during the winter. Petitioner planted corn on those acres. In 1943 he bred a sow, obtaining a litter in the fall *50 of that year. The corn crop was poor, yielding about 18 1/2 bushels. Petitioner was forced to purchase hog feed, which had risen in price. The pigs were fed during the winter by a neighboring farmer. In 1944 another litter of pigs was produced. Both the price of hogs and hog feed were then fixed at OPA ceiling prices. Having concluded that the market for pigs was poor, and to avoid the cost of feeding during the winter, petitioner sold all of his pigs in November 1944. In the fall of 1943, after the corn crop of the previous season had been cleared and the field fertilized, petitioner planted winter wheat. The yield in 1944 was poor, a large portion of the crop was fed to the chickens, and the remainder spoiled# Some wheat and corn was planted in subsequent years. Petitioner never cultivated more than five of his ten tillable acres. From 1943 through the taxable period petitioner planted a garden on one acre to raise vegetables. During 1945 he raised potatoes, tomatoes, cabbages, beans, and peas, and maintained about 50 chickens. In 1943 petitioner purchased, for $587.93, a 1937 Buick, which had been run about 59,000 miles, and which was subsequently used for hauling feed, seed, *51 and fertilizer and for other transportation. No depreciation was claimed for the car for 1943. During petitioner's absence, it was the only means of transportation at the property. In the same year petitioner purchased, for $40, a set of used plows. In the same year petitioner purchased, for $191.24, a 1928 Fordson tractor, not in running condition, which required new coils and piston rings, soldering of the radiator and gasoline tank, and reboring of the cylinders. Petitioner had it overhauled for use in plowing and other work, capitalizing the cost of repairs. In 1945 the gears of the tractor had been stripped and it was no longer in operating condition, petitioner purchasing another tractor in that year. In 1944 petitioner purchased a used deep freeze unit which was kept at petitioner's home in Pittsburgh. Despite repairs costing $97, the unit could not be renovated to produce temperatures low enough to freeze vegetables. During the years in dispute the property was used by petitioner and his family as a summer home. During the summer months petitioner's wife and sons lived on the property, while petitioner was frequently there during the week and on week-ends. Petitioner made *52 memoranda of cash receipts from the sale of produce. He did not make current entries of such receipts on his records. The entries in petitioner's books of receipts and expenditures with respect to his agricultural products were made at the end of each calendar year. Petitioner's records show the following: His income from the property for 1943 totaled $88, consisting of $27 from sale of potatoes, $40 from sale of vegetables, and $21 from sale of eggs. His income from the property for 1944 consisted of $238.42, proceeds from the sale of pigs. His income for 1945 totaled $117.88, consisting of $35.25 from the sale of vegetables, $35.25 from the sale of eggs, $30 from sale of chickens, $12.38 from sale of grain and $5.00 from sale of tomato plants. His records carried expenses for the property, not all of which were claimed at the hearing, of $1,340.33 and $1,630.92 for 1944 and 1945, respectively which included the cost of labor furnished by other than members of the family, fuel, feed ($103.78 for 1945), repairs and maintenance, fertilizers, seed, supplies, electricity, taxes, and insurance. During the period subsequent to that in controversy, petitioner suffered losses at the property *53 of approximately $638, $123, $238, and $260, respectively, for the years 1946 to 1949, inclusive. During the years in controversy petitioner was not engaged in the trade or business of farming and his operations were not conducted primarily for profit. Opinion We may accept petitioner's statement as to the legal principle to be applied in situations such as this: "The question of whether farm losses are allowable deductions depends upon the intention of the taxpayer in engaging in the operations which resulted in the losses. * * * This intention may be ascertained not only from the taxpayer's statements as to the reasons for operating his farm * * * but also from other facts in the case which have a bearing on the issue. * * * No two cases are factually alike and therefore each case must turn upon its own facts." From the approach so suggested, our finding of fact that the claimed expenditures did not result from an operation entered upon by petitioner for pecuniary profit disposes of the proceeding. We reach that conclusion on the whole record and as the result of a number of considerations. There were several benefits to be obtained by petitioner from the purchase and operation *54 of his country place other than its potentialities as a money-making operation. He acquired a summer home for his family, a healthful and educational activity for his sons and to some extent for himself, a source of sustenance for his family in a period when it is well known many people found the food situation something of a problem. "* * * It does seem to me that if a man does not expect to make any gain or profit out of the management of the farm, it cannot be said to be a business for profit, and while I should be the last to say that the making of a profit was not of itself a pleasure, I hope I should also be one of those to agree there were other pleasures than making a profit. * * * it does make a difference whether the occupation which gives him pleasure can honestly be said to be carried on for profit. Unless you can find that element it is not within the statute. * * *" Learned Hand, District Judge, in . Petitioner, although a practicing accountant, made no effort to maintain careful current records of his farming operations. There is no evidence that a man possessed of an intelligence like petitioner's would ever have assumed *55 that the property as operated could be a money-making venture. In fact, the products which petitioner grew with the least difficulty were the ones for which his records show either no cash receipts whatever or negligible amounts; while the record indicates that during the years before us petitioner did not seriously engage in those phases of farming operations which he himself indicates were the ones that might conceivably have brought financial success. [1] Finally, although petitioner's brief insists that "his financial status was such that it was necessary for him to supplement his income," this record shows that his country place was a source of expense not only in and prior to the years in controversy, but for the entire period covered by the record, which totals almost ten years. *56 "* * * It is true that a record of continual losses over a series of years does not in itself preclude the allowance of such losses as a business expense. The intent of the taxpayer in making his expenditures is what counts; but the continuing lack of profits is an important factor bearing on the taxpayer's true intention." . "In his regulations the Commissioner properly recognized the distinction between property operated as a business venture and property used for recreation or as a hobby. In the one instance the dominant motive is the realization of a profit; in the other the objective is pleasure or relaxation, and regular operation at a loss would have little effect upon continued operation. * * * we think the Board correctly concluded that the greater emphasis was upon the cultivation of the orchard as an adjunct to the country estate, rather than as a business venture. * * *" . As we said in , "The petitioners owned and operated the farm not for the purpose of profit or livelihood, but to provide *57 them at their country place with food of good quality. Sale or profit was not their purpose. Sale was merely a resulting incident in the disposition of the minor and varying suplus. Evidently the farm would have been carried on whether sale could have been made of this surplus or not. The primary intention was not to run a business or make a profit, but to produce good food for home consumption." To this we may add in this case that if petitioner's purpose was in addition to provide a wholesome environment for his family, he would be subject to no greater criticism. But the deductibility of his expenditures would be equally without foundation. . Decision will be entered for the respondent. Footnotes
1. Petitioner testified that he raised vegetables, as well as ducks, sheep, geese, and chickens. Yet, as our findings show, no part of petitioner's income for the year 1944 was attributable to the sale of any of these items. His only income for that year resulted from the disposition of pigs which with the brood sow were disposed of once and for all in that year. Similarly, the testimony that he harvested in 1944 a winter wheat crop planted in 1943 is the last precise information given as to the raising of feed which, however, was indicated by petitioner as being important to the operation of a profitable farm. Of the $117 claimed to have been received for agricultural products in 1945, $65.25, or over half, resulted from the sale of eggs and chickens, although petitioner's feed bill alone for that year was $103.78. And there is no mention at any time of any sales of the ducks, sheep, and geese.↩